# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                      Case No. 18-CR-190

CHRISTOPHER E. LOVEJOY JR.,

    Defendant.

## REPORT AND RECOMMENDATION ON
## DEFENDANT'S MOTION TO SUPPRESS IDENTIFICATION, ECF NO. 20

      On August 25, 2018, two men, one armed with a handgun, robbed a cellphone store located on the southside of Milwaukee. The lone employee working at the time called the police, explained how the robbery went down, and provided a description of the suspects. Four days later, she picked each of them out of a live lineup. The two men were subsequently charged in federal court with committing a series of cellphone-store robberies, including several involving a firearm.

      One of those men, Christopher E. Lovejoy Jr., has moved to suppress the employee's identification, arguing that it violated his due-process rights. Discovery revealed that the employee in fact didn't identify Mr. Lovejoy during the lineup itself; rather, she pegged Lovejoy as one of the perpetrators during a post-lineup interview with the detective assigned to the case. Although this procedure raises a

number of red flags, it was not so unnecessarily suggestive as to create a substantial likelihood of irreparable misidentification. The Court will therefore recommend that the suppression-motion be denied.

## I. Background

### A. Stipulated facts

At approximately 2:55 p.m. on August 25, 2018, DC was working alone at Cricket Mobile on South Cesar Chavez Drive in Milwaukee when two black males entered the store wearing ballcaps and sunglasses. Stipulations, ¶ 1, ECF No. 34; *see also* Exhibit 1 to Stip. (available in hard copy only). After inquiring about switching services, one of the subjects (Suspect 1) stated they wanted the money. Stip. ¶¶ 3–5; *see also* Exhibit 2 to Stip., ECF No. 34-1; Exhibit 3 to Stip., ECF No. 34-2. The other subject (Suspect 2) then pulled a small, silver handgun out of his right pocket, pointed the gun in the direction of DC, and demanded the key for the cash register.

DC led the two men to a back-storage room and pointed out where the keys were kept. *See* Stip. ¶ 5; Ex. 1; Ex. 3, at 2. Suspect 1 grabbed the keys and returned to the front of store while Suspect 2—with the gun held near his hip and pointed down—and DC remained in the storage room. Suspect 2 joined Suspect 1 in the front area; DC followed and watched from the doorway as Suspect 1 took money from the cash registers and placed it in his right pocket. The two men then left the store with the cash just as another customer entered. DC told the customer the

2

store had just been robbed. After he left, DC locked the door behind him and called 911. The entire encounter lasted about two-and-a-half minutes.

Officers from the Milwaukee Police Department showed up within a few minutes of the robbery. Stip. ¶¶ 2–3. DC was crying and visibly upset. She told officers what happened and provided a description of the two suspects:

- Suspect #1: black male, 5′7″–5′8″, 20s, thin, dark complexion, unknown clothing
- Suspect #2: same but a little taller and armed with a pistol

Ex. 2, at 2. About forty minutes later, DC was interviewed by Detective Christopher K. Schlachter. Stip. ¶¶ 4–6, 8. She expanded on her story and her description of the suspects:

- Suspect #1: B/M, 24-25, 5′07″-50′8″, 180, medium build, dark skin complexion, baseball cap, white shirt, dark pants, glove on right hand, covering only right thumb and index finger.
- Suspect #2: B/M, 26-27, 5′05″-5′06″, 150-160, thin build, dark skin complexion, dark pants, and armed with a small silver pistol.

Ex. 3, at 3. The police also viewed the surveillance video of the incident. *See* Ex. 1.

On August 28, 2018, Christopher E. Lovejoy Jr. was arrested for his alleged role in the Cricket Mobile armed robbery. Stip. ¶ 9. The following day, law enforcement conducted live lineups for Mr. Lovejoy and his suspected accomplice, Leon S. Barnes, at the Police Administration Building in downtown Milwaukee. Both lineups were videotaped. *See* Exhibit 4 to Stip. (available in hard copy only). Present in the gallery for each lineup were several witnesses (including DC), Detective Schlachter, and another MPD detective. Each witness was provided a Line-up Identification Form prior to the start of each lineup. Stip. ¶ 11. The Form

3

described the lineup procedure and advised that "[t]he person who committed the crime may or may not be included" and that witnesses "should not feel [they] have to make an identification." Exhibit 5 to Stip., ECF No. 34-3; Exhibit 6 to Stip., ECF No. 34-4. The Form also stated, "Upon conclusion of this process you will be interviewed by an investigator." *Id.*

The Barnes lineup was first. Stip. ¶ 10. The witnesses were shown six individuals, one at a time. Stip. ¶ 12. DC filled out a Line-up Identification Form for the Barnes lineup. Stip. ¶ 13 (citing Ex. 5). She circled "No" for each individual other than No. 4; she placed a question mark next to that number. *See* Ex. 5. After the Barnes lineup, DC was escorted by Detective Schlachter to a different room for an interview. *See* Exhibit 7 to Stip., ECF No. 34-5. The interview was not recorded. DC showed Detective Schlachter her Line-up Identification Form. She then told Detective Schlachter that the individual who was in position No. 4 was the one who had the gun during the robbery. On the Form, DC circled "Yes" for No. 4, indicated that she had identified a perpetrator, and wrote that the person she identified was in position No. 4. *See* Ex. 5. That person was Mr. Barnes. *See* Ex. 7.

Immediately after the interview, DC returned to the lineup room for the Lovejoy lineup. Stip. ¶¶ 10, 15. Again, six individuals were shown one at a time. Stip. ¶ 12. Mr. Lovejoy, however, refused to stand for the lineup or change out of his orange jail jumpsuit. So, each individual was viewed in a wheelchair and covered from the neck down in a blanket. DC filled out a Line-up Identification Form for the

4

Lovejoy lineup. Stip. ¶ 13 (citing Ex. 6). She circled "No" for all six individuals and indicated that she had not identified a perpetrator. *See* Ex. 6.

Thereafter, DC was interviewed again by Detective Schlachter. *See* Exhibit 8 to Stip., ECF No. 34-6. After showing Detective Schlachter her Line-up Identification Form, DC stated that she believed the individual who was in position No. 2 was the one who took the money during the robbery. DC explained that she circled "No" on the Form because she wanted to view the individuals standing up for the lineup. DC then put an "X" over her "No" response for No. 2, circled "Yes" for No. 2, crossed off "not identified," circled "identified," and wrote that the person she identified was in position No. 2. *See* Ex. 6. DC also initialed her changes on the Form. Mr. Lovejoy was in position No. 2. *See* Ex. 8.

## B. Procedural background

Mr. Lovejoy and Mr. Barnes were indicted on October 10, 2018. *See* Indictment, ECF No. 1. Count One charges both men with robbing a Metro PCS store on August 12, 2018. Count Two charges Mr. Lovejoy with robbing a Boost Mobile store on August 15, 2018. Count Three charges Mr. Barnes with robbing the Metro PCS store again on August 24, 2018. Count Four charges Mr. Barnes with brandishing a firearm during the second Metro PCS robbery. Count Five charges both men with robbing the Cricket Mobile store on August 25, 2018. Count Six charges both men with brandishing a firearm during the Cricket Mobile robbery. And Count Seven charges Mr. Barnes with possessing a firearm as a convicted felon.

5

The matter is assigned to United States District Judge Pamela Pepper for trial and to this Court for resolving pretrial motions. *See* 28 U.S.C. § 636; Fed. R. Crim. P. 59; E.D. Wis. Gen. L. R. 72. The trial date has been adjourned. *See* Text Only Order, ECF No. 31.

On November 20, 2018, Mr. Lovejoy filed a motion to suppress DC's identification of him as a participant in the Cricket Mobile armed robbery. *See* Defendant's Motion to Suppress Identification, ECF No. 20. At the government's request, *see* Government's Letter, ECF No. 21, on March 6, 2019, the Court held an evidentiary hearing on the motion, *see* Court Minutes of Evidentiary Hearing, ECF No. 37. The Court heard testimony from DC; Detective Schlachter; and Lawrence T. White, a psychology professor at Beloit College. *See* Transcript of Evidentiary Hearing, ECF No. 39. Several exhibits were admitted into evidence at the hearing. *See* Exhibit List, ECF No. 38. After the evidentiary hearing, the parties submitted simultaneous, post-hearing briefs. *See* Government's Response to Defendant's Motion to Suppress Identifications, ECF No. 43; Defendant's Brief in Support of Motion to Suppress Identification, ECF No. 44. Accordingly, the suppression motion is fully briefed and ready for resolution.

## II. Discussion

Mr. Lovejoy seeks an order excluding DC's lineup identification and any in-court identification of him at trial, arguing that the lineup procedure violated his Fifth Amendment right to due process.

6

## A. Applicable law

"Eyewitness identification testimony can violate a defendant's constitutional right to due process of law when it creates a 'substantial likelihood of irreparable misidentification.'" *Gregory-Bey v. Hanks*, 332 F.3d 1036, 1045 (7th Cir. 2003) (quoting *Neil v. Biggers*, 409 U.S. 188, 198 (1972)). "To determine whether a particular procedure violated a defendant's constitutional rights, [courts] undertake a well-settled, two-pronged analysis: (1) whether the process was unduly suggestive, and (2) if so, whether the identification was nevertheless sufficiently reliable." *United States v. Recendiz*, 557 F.3d 511, 524 (7th Cir. 2009) (citing *United States v. Griffin*, 493 F.3d 856, 865 (7th Cir. 2007); *Rodriguez v. Peters*, 63 F.3d 546, 556 (7th Cir. 1995); *United States ex rel. Kosik v. Napoli*, 814 F.2d 1151, 1155 (7th Cir. 1987)).

In assessing the reliability of an identification, courts must consider the totality of the circumstances, including:

> (1) the opportunity of the witness to view the criminal at the time of the crime . . . , (2) the witness's degree of attention during such an opportunity, (3) the accuracy of the witness's prior description of the criminal . . . , (4) the level of certainty demonstrated at the time of the identification, and (5) the time between the crime and the identification.

*Recendiz*, 557 F.3d at 525 (citing *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). "[W]hen indicators of a witness's ability to make an accurate identification are not outweighed by the corrupting effect of the challenged identification, the evidence (if otherwise admissible) should be submitted to the jury." *United States v. Gonzalez*,

7

863 F.3d 576, 587 (7th Cir. 2017) (citing *Perry v. New Hampshire*, 565 U.S. 228, 232 (2012)).

Where a witness's lineup identification is suppressed as unlawful, an in-court identification is permissible only if the government shows "by clear and convincing evidence that there is an independent basis for [the] witness's in-court identification." *United States v. West*, 628 F.3d 425, 428 (7th Cir. 2010) (citing *United States v. Wade*, 388 U.S. 218, 240–41 (1967)). In determining whether there exists an independent basis for an in-court identification, courts must consider the totality of the circumstances, including:

> the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification.

*Wade*, 388 U.S. at 241. "Whether a pretrial identification procedure is unduly suggestive and whether a witness's subsequent identification is nonetheless reliable under the totality of the circumstances are two separate inquiries that should be approached sequentially." *United States v. Johnson*, 859 F.2d 1289, 1294 (7th Cir. 1988).

### B. Analysis

Mr. Lovejoy does not challenge the actual live lineup. Rather, he takes issue with Detective Schlachter's post-lineup interview during which DC changed her answer and identified Mr. Lovejoy as one of the perpetrators of the Cricket Mobile

8

armed robbery. According to Mr. Lovejoy, that interview was unduly suggestive, and DC's identification was unreliable under the totality of the circumstances.

### 1. Whether the identification procedure was suggestive and unnecessary

The post-lineup interview was clearly unnecessary. DC did not make a positive identification during the Lovejoy lineup. Though the Line-up Identification Form indicates that witnesses will be interviewed after the lineup is over, it is unclear why witnesses are interviewed when they fail to make an identification. Detective Schlachter testified that he interviews all witnesses, regardless of whether they make an identification, because that is MPD's policy. That is inaccurate. The MPD standard operating procedure for live lineups states that "a follow-up interview shall be conducted" after a positive identification. *See* Exhibit 9, at 6. However, the SOP is silent on what to do after a negative identification, and Detective Schlachter admitted that he didn't receive any training on how to conduct such interviews.

Moreover, Detective Schlachter's purported explanation for the interview was unpersuasive:

> Q. What about if someone is unable to identify someone in a lineup, are they still interviewed?
> A. Yes.
> Q. Why is that?
> A. It's the same reason. They tell you they're unable to identify. They are unable to identify.

Tr. at 62:25–63:5. It was clear from the Form that DC was unable to identify a perpetrator during the lineup, so there was no good reason—at least none was

9

offered—for follow-up questioning. *See United States v. Hawkins*, 499 F.3d 703, 707 (7th Cir. 2007) (citing *United States v. Stevens*, 935 F.2d 1380, 1383 (3d Cir. 1991) ("To determine whether, under the circumstances, the suggestive identification was unnecessarily so, we must determine whether there was a good reason for the failure to resort to a less suggestive alternative.")).

While the post-lineup interview may have been flawed, Mr. Lovejoy has failed to demonstrate that the procedure was unduly suggestive. DC testified that she had a "gut feeling" during the lineup that the person in position No. 2 was one of the perpetrators, but she still circled "No." Tr. at 33:22–34:5. Immediately after the lineup, DC was interviewed by Detective Schlachter, and she "realized it was number two." Tr. at 34:6–22. Though she couldn't recall the exact nature of the conversation, DC was adamant that Detective Schlachter did not say anything to make her change her mind. Tr. at 34:23–36:7. DC stated she changed her answer on her own volition. Tr. at 38:21–39:20.

Likewise, Detective Schlachter testified that DC told him the person in position No. 2 was one of the robbers immediately after she handed him the Form. Tr. at 76:24–77:11, 78:1–6. Detective Schlachter further testified that he didn't instruct DC to change her answer, Tr. at 79:8–23, and that he didn't indicate that she had made the correct choice, Tr. at 80:14–18. The testimony regarding what transpired in the interview room was credible and uncontroverted.

Mr. Lovejoy maintains that DC's change of mind demonstrates that the interview was suggestive. *See* Def.'s Mot. at 6; Def.'s Br at 2. This about-face was

10

Case 2:18-cr-00190-LA    Filed 06/26/19    Page 10 of 20    Document 46

unusual[1] and certainly raises red flags about what happened during the interview. That the interview was not recorded, even though such equipment was likely available to Detective Schlachter, significantly enhanced the potential for foul play. Recording post-lineup interviews "preserves the integrity of the evidence and minimizes the risk that erroneous (or coerced) eyewitness identifications go undetected." *See Hart v. Mannina*, 798 F.3d 578, 588 (7th Cir. 2015). Transparency is important. But the fact a witness has changed her mind does not establish per se suggestibility.

Mr. Lovejoy also claims that Detective Schlachter made a suggestive statement to DC during the post-lineup interview. *See* Def.'s Br. at 3–5. Detective Schlachter "told [DC] just because she circled yes to a certain individual, that does not mean that that person automatically gets arrested or charged with any crime. There's further investigation that takes place after the lineup is conducted." Tr. at 78:15–19. According to Professor White, this statement

> [potentially] lowers the threshold for choosing. So that a witness who may have been reluctant to say number two is the guy then hears that statement and now may be more willing to choose number two. Because if God forbid I've made a mistake, they're going to keep investigating the case and other evidence will prove his innocence.

Tr. at 119:7–119:13. Immediately after this statement, DC changed her answer, and her confidence level increased from 60–75% certain to 100% certain. Tr. at 41:24–42:13. These facts, in Mr. Lovejoy's view, show that DC was improperly influenced by Detective Schlachter's statement.

---

[1] Detective Schlachter couldn't recall a witness changing her mind during the 30–40 other lineups he was involved in. Tr. at 82:1–6, 105:17–22.

11

Although it seems that Detective Schlachter's statement did provide DC the courage to change her answer, there is no evidence that he steered her to select Mr. Lovejoy. "An identification procedure is unduly suggestive when *it is so suggestive as to create a substantial likelihood of irreparable misidentification*." *Gregory-Bey*, 332 F.3d at 1047 (citing *United States v. Moore*, 115 F.3d 1348, 1360 (7th Cir. 1997)). "The danger to be avoided in identification procedures is that of *orchestrating* the procedure so that one particular suspect stands out from the others and the procedure implicitly suggests to the witness that 'this is the man.'" *Gregory-Bey*, 332 F.3d at 1045 (citing *Foster v. California*, 394 U.S. 440, 442–43 (1969)). Here, the evidence shows that the idea to select the person in position No. 2 originated with DC, not Detective Schlachter, and Schlachter did nothing to encourage that idea. His statement therefore did not create a substantial likelihood of irreparable misidentification. *See Gregory-Bey*, 332 F.3d at 1047 (telling witness that another witness had selected a suspect from the same photos she was about to examine was not unduly suggestive).

Mr. Lovejoy argues that the effect of Detective Schlachter's statement was compounded by the fact that he was a lead detective in the investigation and knew Lovejoy's identity. *See* Def.'s Br. at 6–9. The failure to follow the preferred "double-blind" method of administering identification procedures—where neither the witness nor the administering officer knows the identity of the suspect—created an avoidable risk that Detective Schlachter inadvertently cued DC on whom to select. *See Hart*, 798 F.3d at 588 n.1 (citations omitted). However, "[t]he Supreme Court

12

has not adopted a rule that only 'the best' approach (as the latest social science research identifies the best current understanding) can be used." *United States v. Johnson*, 745 F.3d 227, 229 (7th Cir. 2014). Thus, while it would have been preferable for another detective to conduct the interview (and for the interview to have been recorded), deviating from that best practice does not mandate suppression of DC's identification. In this case, the procedures of trial—such as robust cross examiner—are sufficient "to allow jurors to separate reliable from mistaken identifications." *See id.* Any likelihood of a misidentification is therefore reparable.

Finally, Mr. Lovejoy claims that the interview was suggestive because Detective Schlachter asked DC *what* made her certain of her identification and not *whether* she was certain. *See* Def.'s Br. at 11–12. The phrasing of this question may have increased DC's confidence level in choosing Mr. Lovejoy. However, because it was not asked until after DC changed her answer, *see* Tr. at 68:17–69:1; 79:3–7, the risk of an irreparable misidentification is very low. *See Gregory-Bey*, 332 F.3d at 1047 ("We do not think that the fact that the police 'seemed happy' after [the witnesses] had selected [the target] from the stack of photos raises even an iota of concern that the police's 'suggestion' might have caused an 'irreparable misidentification.'").

Because Mr. Lovejoy has failed to demonstrate that the post-lineup interview was unnecessarily suggestive, the Court does not need to consider whether DC's identification was otherwise reliable. *See United States v. Sleet*, 54 F.3d 303, 309

13

(7th Cir. 1995) (citations omitted). Nevertheless, because the district judge may ultimately disagree with this finding, the Court will proceed to the second prong.

## 2. Whether the identification is otherwise reliable

Even if the post-lineup interview was unduly suggestive in some respect, the Court still would not recommend suppression because, based on the totality of the circumstances, DC's identification was reliable.

*The opportunity to view*

The surveillance video shows that DC had a sufficient opportunity to view both robbers. *See* Ex. 1. The robbery occurred mid-afternoon on a sunny day inside an open, well-lit cellphone store. Two men entered the store wearing hats and sunglasses and approached DC as she stood behind a register. The men came face-to-face with DC and spent about twenty seconds inquiring about cellphone services before Suspect 2—alleged to be Mr. Barnes—pulled out a gun and asked for the key to the register. Then the three of them went to a back-storage room where DC pointed Suspect 1—alleged to be Mr. Lovejoy—to the keys. DC remained in the storage room with Suspect 2 for several seconds while Suspect 1 went back up front to take the money from the registers. DC then stood in the doorway and watched Suspect 1 place the loot in his pocket before the two men left. The entire encounter lasted about two-and-a-half minutes.

*The degree of attention*

DC's attention during the robbery was focused on the two robbers. Tr. at 17:1–3. She was working alone, and there were no other customers in the store

14

when the two men entered. *See* Ex. 1. DC testified that, while in the back-storage room, she was particularly focused on Suspect 1, who was looking for the key to the cash register:

> Q. Who were you focused on at that point?
> A. The one looking for the key.
> Q. And what were you attempting to -- What were you attempting to do at that point?
> A. To remember as much as I can of his features because I was off to the side of him. I was trying to remember as much as I could.

Tr. at 19:8–14. Indeed, DC had previously been trained to focus on a suspect's physical features during a robbery. *See* Tr. at 13:4–17.

Mr. Lovejoy argues that DC's attention was distracted by Mr. Barnes's brandishing of a firearm. *See* Def.'s Br. at 17–18. According to Professor White, studies show that the reliability of an identification is diminished when a weapon is used because witnesses tend to focus on the weapon and not the suspect's face. Tr. at 131:18–132:15. And DC did testify at one point that she was more focused on the person who had the gun. Tr. at 44:6–7.

However, the evidence demonstrates that the so-called weapon-focus effect did not materialize in this case. Despite the presence of the gun, DC was able to provide a thorough and accurate description of the robbery. *Compare* the surveillance video (Ex. 1) *with* Detective Schlachter's police report (Ex. 3, ECF No. 34-2). She even recalled subtle details such as Suspect 1 wearing a glove that covered only his right thumb and index finger and placing the stolen cash in his right pocket. *See* Ex. 3, at 3. DC's ability to accurately recall details of the robbery confirms her attentiveness.

*The accuracy of the description*

DC provided a description of the suspects within minutes of the robbery. It included the suspects' race, height, age, build, and complexion. *See* Ex. 2, at 2, ECF No. 34-1. About forty minutes later, and without viewing the surveillance video or any photographs, she provided an even more detailed description. She described Suspect 1 as follows: black male; 24–25 years old; 5′7″–5′8″ tall; 180 pounds; medium build; dark skin complexion; and wearing a baseball cap, a white shirt, dark pants, and a glove on his right hand that covered only his right thumb and index finger. *See* Ex. 3, at 3. This description matches Suspect 1's appearance, as seen on the surveillance video, save for his skin complexion, which appears to be light (rather than dark) brown. *See* Ex. 1. Also, Mr. Lovejoy was 32 years old at the time of the robbery, and the arrest report lists his height as 6′0″. Stip. ¶ 7, ECF No. 34.

*The witness's level of certainty*

DC was unable to make an identification during the Lovejoy lineup. She switched her answer and selected the person in position No. 2—Mr. Lovejoy—while being interviewed by Detective Schlachter minutes thereafter. The interview was not recorded, and Detective Schlachter's supplemental report does not reflect DC's level of certainty. *See* Ex. 8, ECF No. 34-6. Indeed, Detective Schlachter admitted that he asked DC what made her certain, not whether she was.

At the evidentiary hearing seven months later, DC estimated that she was 60–75% sure during the lineup that No. 2 was one of the robbers; she claimed her

16

level of confidence reached 100% by the time of the interview. Tr. at 41:24–42:13. DC stated that she wasn't 100% positive during the lineup because Mr. Lovejoy was sitting in a wheelchair, so she couldn't ascertain his height. Tr. at 42:14–23. Also, Mr. Lovejoy's hair appeared different from how it was on the day of the robbery. Tr. at 42:23–43:17. Once in the interview room, however, she "realized it was number two," Tr. at 34:22; "[h]e was the one that stood out," and she had a "gut feeling" it was him, Tr. at 35:13–14.

This factor detracts from the reliability of DC's identification. According to Professor White, research shows that a witness's initial level of certainty is the best predictor of accuracy; subsequent expressions are less useful because a witness's confidence almost always increases over time. Tr. at 112:25–114:7. The evidence demonstrates that DC was initially uncertain whether Mr. Lovejoy was one of the robbers, as she circled "No" on the Line-up Identification Form. In contrast, during the Barnes lineup, DC signaled which way she was leaning by placing a question mark next to No. 4. DC did not use a question mark or other placeholder during the Lovejoy lineup. *Compare* Ex. 5, ECF No. 34-3, *with* Ex. 6, ECF No. 34-4. Moreover, DC did not state her level of certainty at the time she switched her answer, and the estimates she provided at the hearing are relatively meaningless. By that point, DC knew that Mr. Lovejoy had been arrested and charged with the Cricket Mobile robbery, and she agreed to testify at the suppression hearing.

17

*The time between the crime and the identification*

DC provided the police a description of the suspects within minutes of the robbery. The lineups and interviews took place four days later. Four days is an insignificant time gap, notwithstanding that DC had no previous dealings with the robbers. *See Griffin*, 493 F.3d at 866 (finding reliable an identification made four months after a robbery).

*Other factors*

Mr. Lovejoy maintains that DC's identification is also unreliable because it involved a cross-racial identification, the suspects were wearing a disguise, and the robbery has highly stressful. *See* Def.'s Br. at 18–20. The Court respectfully disagrees. DC was able to recall specific details about the suspects even though they were wearing hats and sunglasses, and the surveillance video shows that DC remained calm and composed throughout the encounter. Also, to the extent that race played a role in DC's identification, its effect is outweighed by other factors (described above) that favor reliability.[2]

\*\*\*

Overall, the Court finds that DC's ability to make an accurate identification is not outweighed by the corrupting effect of the challenged identification. *See Brathwaite,* 432 U.S. at 114–16. During the robbery, DC focused her attention on

---

[2] The government argues that DC's identification of Mr. Lovejoy is also corroborated by Mr. Barnes, who admitted to committing the Cricket Mobile robbery with Lovejoy. *See* Govt's Resp. at 19 (citing Exhibit 10), 22. However, the government has not provided any authority to support its argument that a co-defendant's confession can enhance the reliability of a suggestive identification.

18

the suspects' physical features. The surveillance video shows that she remained calm. The robbery lasted two-and-a-half minutes and, after the suspects left, DC called the police, explained in detail what had happened, and provided a detailed description of the suspects. Those descriptions, while not perfect, were "more than ordinarily thorough." *See United States v. Goodman*, 797 F.2d 468, 470 (7th Cir. 1986) (quoting *Biggers*, 409 U.S. at 200). Four days after the robbery, DC picked Mr. Lovejoy out of a live lineup.

The only factor that weighs against the reliability of DC's identification is her lack of certainty, as demonstrated by her changed answer. This questionable feature, however, does not result in a substantial likelihood that Mr. Lovejoy was misidentified. The fact that DC identified Mr. Lovejoy during the post-lineup interview but not the live lineup "affects the weight the jury might give to [her] identification, not the reliability of the identification itself." *See Hawkins*, 499 F.3d at 711 (citing *United States v. Moore*, 936 F.2d 1508, 1520–21 (7th Cir. 1991)).

### III. Conclusion

For all the foregoing reasons, the Court finds that there was not a substantial likelihood that DC misidentified Mr. Lovejoy during the post-lineup interview. Because the lineup identification did not violate due process, the government does not need to demonstrate an independent basis for any in-court identification by DC. Accordingly, the Court will recommend that Mr. Lovejoy's suppression-motion be denied.

**NOW, THEREFORE, IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Identification, ECF No. 20, be **DENIED**. Court staff will contact counsel to schedule a status conference to discuss the objection process and defense counsel's Motion to Withdraw, ECF No. 45.

Dated at Milwaukee, Wisconsin, this 26th day of June, 2019.

BY THE COURT:

*s/ David E. Jones*
DAVID E. JONES
United States Magistrate Judge

20

Case 2:18-cr-00190-LA   Filed 06/26/19   Page 20 of 20   Document 46