UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

             Plaintiff,

      v.                                        Case No. 18-cr-190-pp

CHRISTOPHER E. LOVEJOY, JR.,

             Defendant.

**ORDER ADOPTING JUDGE JONES'S RECOMMENDATION (DKT. NO. 46) AND DENYING DEFENDANT'S MOTION TO SUPPRESS (DKT. NO. 20)**

The government charged the defendant with three Hobbs Act robberies and brandishing a firearm in furtherance of one of those crimes. On November 20, 2018, the defendant filed a motion to suppress the lineup identification of the defendant and any in-court identification at trial. Dkt. No. 20 at 1. The defendant argues that the lineup identification violated his Fifth Amendment right to due process because the procedure was unduly suggestive. Id. Magistrate Judge David E. Jones scheduled an evidentiary hearing, but the defendant then asked him to adjourn the hearing and the trial dates to accommodate the schedule of a potential expert witness. Dkt. Nos. 28-29. Judge Jones granted that motion, dkt. no. 30, and ended up holding the evidentiary hearing on March 6, 2019, dkt. no. 37. He then issued a report recommending that the court deny the motion to suppress. Dkt. No. 46. The defendant filed his objection on July 29, 2019, after receiving an extension of

time. Dkt. No. 50. The government filed a response, dkt. no. 51, and the defendant filed a reply, dkt. no. 52. The court will adopt the recommendation and deny the motion to suppress.

## I. Background

### A. The Defendant's Motion to Suppress

The defendant moved to suppress the identification procedure because the witness, DC, did not identify the defendant in the initial lineup. Dkt. No. 20. She changed her answer to identify the defendant after meeting with the detective involved with the investigation. Id. The defendant alleged that the Milwaukee Police Department did not use a double blind method (where the administering officer does not know the target). Id. at 6 (citing Hart v. Mannina, 798 F.3d 578, 588 n.1 (7th Cir. 2015)). He also challenged the fact that the police did not record the interview (even though they had recorded the lineup). Id.

The defendant argued to Judge Jones that this procedure was unnecessary, unduly suggestive and unreliable. First, he cited DC's testimony—she gave an inaccurate description of the defendant. The witness described the suspect as younger, shorter and darker-skinned than the police report indicates. Id. at 8. Second, he asserted that DC had limited opportunity to observe the suspects because the robbery took place over two minutes according to surveillance video in the store. Id. at 8-9. Third, the defendant alleged that the number of people in the store and the changes in location

affected DC's ability to pay attention, and that four days had passed between the incident and the lineup. Id. at 9.

The government agreed that a hearing was necessary. Dkt. No. 21.

B.      Facts

The parties prepared a stipulation, and produced the police reports, lineup forms and the video of the robbery and lineups for the evidentiary hearing. Dkt. Nos. 38-39, Exs. 1-11. At the hearing, the government called DC and Detective Schlachter. Dkt. No. 39 at 11-108. The defendant called his expert, Professor Lawrence T. White, who is a professor of psychology in Beloit, Wisconsin. Id. at 109-156.

1.      *Stipulation*

The robbery charged in Count Five occurred at approximately 2:55 p.m. on August 25, 2018, at the Cricket Mobile Store located at 1225 S. Cesar Chavez Drive in Milwaukee, Wisconsin. Dkt. No. 34 at ¶1. DC called 911 at 2:57 p.m.; Officer Vance Scollin arrived on the scene to interview DC. Dkt. No. 34 at ¶2. Schlachter also interviewed DC. Id.

Scollin reported that DC said two black males, one armed with a silver pistol, entered the store and robbed her. Id. at ¶3. She described suspect one (later identified as the defendant) as being 5' 7" to 5' 8" tall, thin, with a dark complexion and unknown clothing. She described the second suspect (later identified as codefendant Leon Barnes), as the same, a little taller with a silver pistol. Id. at ¶3; Dkt. No. 3-1, Ex. 2.

Schlachter also interviewed DC. Dkt. No. 34 at ¶4. DC told Schlachter that two black males entered the store together on August 25, 2018 at 2:55 p.m. They approached her as she was positioned behind one of the two registers. Id. Suspect one asked about switching providers and service on his iPhone. DC responded that they did not have iPhones in stock. Id. Suspect one then said something about wanting money and DC realized the suspects were robbing the store. Id. Suspect two pulled out a small silver colored pistol with his right hand and pointed it at DC. Id. at ¶5. Suspect one moved next to DC behind the register but the registers were locked. Id. Suspect two instructed DC to help suspect one unlock the registers and DC went to the back room at gunpoint. Id. Suspect one, who was wearing a glove covering only his right thumb and index finger, located the key and returned to the register. Id. Suspect one emptied the funds from the cash drawer and placed them on the right side of his body. Id. He then asked for DC's phone and the phone she would use to call 911. Id. She pointed to the cordless phone; he said he didn't want that phone and they left. Id. The robbery lasted approximately two and a half minutes. Id.

DC described suspect one as twenty-four to twenty-five years old, 5' 7" to 5' 8", 180 pounds, medium build, dark skin, wearing a baseball cap, white shirt, dark pants and a glove on his right hand covering only his right thumb and index finger. Id. at ¶6. The Milwaukee Police Department arrest report lists the defendant as thirty-two years old, 6' 0" in height, 175 pounds, with light build, light brown complexion and a beard. Id. at ¶7. DC described suspect two

(later identified as Barnes) as twenty-six to twenty-eight years old, 5' 5" to 5' 6" in height, 150-160 pounds, thin build, dark skin, and dark pants. Id. Police reports list Barnes as 5' 10" and 170 with a medium build. Id. at ¶8.

Three days after the Cricket Mobile robbery, officers arrested the defendant at his residence on North 91st Street in Milwaukee. Id. at ¶9. On August 29, 2018, a day after the defendant's arrest, law enforcement conducted a videotaped interview with the defendant; his hair was styled in two French braids. Id. The officers conducted separate lineups for the defendant and Barnes that same day. Id.

The officers videotaped the lineups. The lineup for Barnes started at 6:19 p.m. and ended sixteen minutes later. The lineup for the defendant followed at 7:30 p.m. and lasted approximately twenty minutes. Id. at ¶10. Before each lineup, the officers gave each witness a Lineup Identification form. Id. at ¶11. The officers read the form to the witnesses in each lineup as they viewed the subjects. Id. The form explained that the person who committed the crime may not be in the lineup and that the individuals would be displayed one at a time in no particular order. Id. The form instructed witnesses not to speak, raise a hand or signal to anyone in the lineup procedure. Id. The form further stated that, after the witnesses had viewed a subject in the lineup, the moderator would ask if the subject in the lineup committed the crime. Id. The witness was instructed to circle "yes" or "no" for each numbered subject. The witness was told that, after the process was completed, the witness would be interviewed by an investigator. Id.

Each lineup followed the same procedure. Id. at ¶12. In both lineups, the witnesses viewed six subjects. Id. Participants in the first lineup stood up for the process. Id. Participants in the second lineup were viewed in wheelchairs with hats on and their bodies covered entirely from the neck down by a blanket. Id. These measures were necessary because the defendant would not change into an orange jail uniform or stand, and he unbraided his hair before the lineup. Id.

DC viewed both lineups and a filled out a Lineup Identification Form for each. Id. at ¶13. After the first lineup, DC circled "no" on the form for everyone other than position four. Id. She put a question mark next to number four on the form. Id. Then Schlachter interviewed DC. Id. at ¶14. He did not record the interview, but he filled out a report. Id. DC told the detective that the subject in position number four was the man armed with the gun during the robbery. Id. Schlachter asked what made DC certain that the robber was number four. Id. DC responded that number four had the same jaw line and overall facial structure as the robber with the gun. Barnes was number four of the lineup. Id.

DC next viewed the second lineup. Id. at ¶15. At the end of the lineup, DC indicated she had not identified anyone and circled "no" for each. Id. Schlachter interviewed DC again. Id. His report states:

> On 8-29-18 at 7:55 p.m., I assisted with the live line-up, which took place at the Police Administration Building. The target of this line-up was Christopher C. LOVEJOY, B/M, 01-04-86 who was in-custody for several business robberies. I was then instructed to conduct an interview of the victim in this offense.

I located the victim, DC, and the interview was conducted on the 4th Floor of the Police Administration Building. DC showed me her line-up form and stated she circled "no" for everyone in the lineup. DC then stated to me that the individual who was in position #2 was the only individual in the line-up that she believed was a suspect in the armed robber. I asked DC if she believed that the individual in position #2 was the suspect in the offense why did she circle "No." DC stated she really wanted to see the individuals standing up for the line-up. DC paused for a brief second and stated she wanted to change the "no" to a "yes" for the individual in position #2. DC then circled "yes" for the individual in position #2 and placed her initials next to it.

I asked DC what made her certain the individual in position #2 was the same suspect in the offense. DC stated when she saw the individual in position #2 with the glasses on, she stated it was the same individual, who she stood next to that removed the money from the register. DC also stated the individual had the same facial structure and the jaw line as the suspect in the robbery. DC stated this was the other suspect in the offense who removed items from thestore.

I thanked DC for her time and cooperation. It should be noted that LOVEJOY was the individual in position #2.

Dkt. No. 34-6 at 1.

> 2. *Hearing*

DC testified at the March evidentiary hearing. Dkt. No. 39 at 12. She said that while working as a cashier at a Speedway, she received training that taught her to remember as much as possible about a person committing a robbery—physical features, height and whatever she could try to memorize. Id. at 13. At the time of the hearing, she worked at Cricket Mobile on South 16th Street. Id. at 14.

On August 25, 2018, DC was alone in the store—eating lunch—when two individuals entered the store. Id. It was sunny and warm outside; both individuals wore sunglasses. Id. at 15-16. They approached where she was

sitting, coming very close. Id. at 16. DC engaged them in conversation and one of the individuals pulled out a gun. Id. They said they were robbing the place. Id. One of the individuals pointed the gun at her torso; DC stepped back. Id. at 17. They instructed DC to help them obtain the keys to the register. Id. at 18. DC followed them into the back room, standing between the one with the gun and the one without the gun. Id. at 19. DC testified that she focused on remembering as much as she could about the features of the man looking for the key (the man without the gun). Id. They returned to the front room and the defendant without the gun put the key in the box and started taking money. Id. at 20. DC stood in the doorway focusing on the features of the man with the gun. Id. at 21.

Law enforcement arrived on the scene and DC provided a statement without looking at any photographs of any suspects or the video of the robbery. Id. at 22. DC participated in a lineup, relying solely on memory without reviewing photographs or the video. Id. at 22, 23. DC completed a lineup identification form. Id. She recalled having a gut feeling that the individual who held the gun was in the first lineup. Id. at 23. DC put a question mark instead of identifying the defendant on the form. Id. She later changed her mind because she was 100 percent sure that it was the individual. Id. at 24. She explained that she wanted to see the rest of the people, using the checkmark as a place keeper. Id. DC testified that she had no doubts about the identification. Id.

DC went with Schlachter to a different room after the lineup. Id. at 25. She did not recall anything that Detective Schlachter said to her in the course of the meeting. Specifically, DC testified:

> Q. Okay. What do you recall happening in regard to your—your change, your identification with the defendant with the gun? Can you tell us about that?
> A. I knew then for sure it was him. I had no doubts in my mind it was him.
> Q. Did Detective Schlachter say anything to you that changed your mind?
> A. No.
> Q. Okay. You knew that it was him?
> A. Yes.

Id. at 26. DC remained in the room with Detective Schlachter "maybe five, ten minutes." Id. at 26. DC said she talked with the detective, but does not remember "exactly" what was said. Id. at 27-28. She does not remember him asking what the question mark meant. Id. at 28.

DC returned to the gallery for a second lineup. Id. at 31. She does not remember whether there was a conversation with Schlachter regarding the second lineup. Id. at 32. An officer instructed her that the participant in the robbery may or may not be in the lineup and that she was not required to make an identification. Id. When she saw the person in position number two of the second lineup, she had the same "type of, like, gut feeling." Id. at 33. In other words, she recognized him. Id. She circled "no" on the form for the person in number two. Id. at 34. Immediately after the second lineup ended, Schlachter interviewed DC in the same room. Id. In the interview, DC realized the robber was number two. Id. She does not recall what she talked about with Schlachter. Id. However, nothing was said between the two of them that made

9

her change her mind on the lineup form. Id. at 35. DC said that number two "stood out," she had a "gut feeling," and she "knew it was him." Id. According to DC, she was in the separate interview room approximately five or ten minutes. Id. DC had no doubts as to who was involved in that second lineup. Id. at 36.

Judge Jones asked DC follow-up questions. She told Judge Jones that she felt no pressure "at all" to circle "yes" or identify a particular individual. Id. at 38. She testified that she circled "yes" when she was with Schlachter, but that he did not encourage or suggest that she circle "yes." Id. at 39. She put her initials next to the circled "yes." Id. at 40. DC had the same level of certainty about number two in the second lineup as she did with number four in the first lineup. Id. at 41. DC testified that she was 100 percent certain that number two was the robber in the second lineup at the time she circled "yes." Id. at 42. In the lineup room, she was "75, maybe 60 percent certain." Id. at 42. DC explained that in the lineup, the person was sitting down and she did not know how tall he was and his hair had been covered up. Id. at 42. She testified that her thought process changed when she focused more on the features. Id. She also testified that she had initially described the suspect without the gun as having a dark complexion but believes she had focused more on the suspect with the gun (who had a dark complexion). Id. at 44. On cross-examination, DC said she was calm during the robbery but emotional after the robbers left. Id. at 48.

Schlachter also testified during the hearing. Id. at 49. He testified that he worked for the Milwaukee Police Department in the robbery division as a

detective for a few months; he worked on the robbery task force for a year and a half, and he worked as a patrol officer for twelve years. Id. at 50. On August 25, 2018, Schlachter arrived at the Cricket Mobile Store at approximately 3:45 p.m. Id. He was not one of the first to arrive; Detective Michael Slomczewski was there to assist. Id. They conducted DC's interview inside the squad car. Id. He said that while upset, DC still gave intelligent, detailed answers to the questions. Id. at 53. Schlachter took notes during the twenty-to-thirty minute interview. Id. Schlachter viewed the video of the robbery but was not aware of DC viewing the video at any point. Id. at 54. He did not show DC photos of any suspects. Id.

Schlachter admitted he was familiar with the recommendation that a double-blind procedure be used for lineups, but noted there was no requirement than an officer involved in the investigation refrain from participating in the lineup. Id. at 60-61. He also acknowledged that Milwaukee Police Standard Operating Procedures dictate that an officer refrain from asking a subject if they are certain about an identification. Id. With a positive identification, officers must conduct an interview after a lineup. Id. at 99. Even if the witness cannot identify someone, officers will still conduct an interview. Id. at 62-63. This allows officers to ask what makes the witness certain (or uncertain), such as facial features, build, height and weight. Id. at 62-63. Schlachter always conducts interviews after a lineup. Id. at 87.

Schlachter also described the process of working a lineup. Id. One team works in the gallery with the witnesses; the other team works behind the

11

scenes making sure that there are fillers and subjects to be viewed by the witnesses. <u>Id.</u> at 66. A detective from the robbery division goes to the Criminal Justice Facility to pick fillers that are the same height and weight. <u>Id.</u> at 66. Schlachter was not involved in that process. <u>Id.</u> The first person shown in the lineup is never the target. <u>Id.</u> at 67. Schlachter played no role in selecting fillers for the lineups at issue.

During the lineups, Schlachter sat in the rear of the room with two or three other detectives. <u>Id.</u> at 63-64. Schlachter attended for the purpose of viewing the lineup and conducting the interviews. <u>Id.</u> He did not know where the suspects would be placed in the lineup. <u>Id.</u> After the interview but before the lineup, Schlachter did not have additional contact with DC. <u>Id.</u> Schlachter, however, saw the booking photos of the suspects and the video of the robbery. <u>Id.</u> at 65.

Schlachter walked with DC to a conference room on the fourth floor of the Police Administration Building. <u>Id.</u> at 67. He did not recall any conversation with DC on their way to the room, and he did not have the ability to record conversations or videotape conversations. <u>Id.</u> at 68. He admits that there may have been rooms available with recording equipment but there was no procedure requiring him to record an interview after the lineup. <u>Id.</u> at 93. At that point, he did not know whether DC had identified a suspect or reacted to the lineup. <u>Id.</u> at 87. Schlachter and DC sat at a long conference table with Schlachter at the head and DC on his right. <u>Id.</u> DC said that number four in the first lineup was the individual who conducted the robbery that day. <u>Id.</u> She

expressed no doubt. Id. at 69. Schlachter never said anything to suggest that number four was the one she should select. Id. DC said that suspect four in the first lineup and the person with the gun had that same facial shape or structure. Id. at 70. They were in the interview room after the first lineup for five minutes and she filled out the bottom of the form. Id. They went back to the lineup room for the second lineup. Id. at 71. Schlachter did not say anything about a target in the second lineup or show her any pictures. Id.

Schlachter testified that the second lineup was different because the individuals were seated, pushed in wheelchairs and covered with blankets. Id. at 72. The targets did not want to cooperate and had to be handcuffed and brought into the lineup in wheelchairs. Id. Schlachter and DC returned to the conference room on the fourth floor, but had no conversations about who she should have picked. Id. He testified they were in the conference room about five minutes. Id. at 73.

Schlachter remembered telling DC in the interview—before she circled "yes"—that just because she circled "yes" to a certain person did not mean that that person would automatically be arrested or charged; further investigation would take place after the lineup. Id. at 78. Almost immediately, DC handed Schlachter the form and told him the person in position number two was the person who committed the robbery. Id. at 77-78. She never said that she couldn't pick out a suspect. Id. at 94. When Schlachter asked DC why she circled "no" if she knew it was number two, she responded that she wanted to see them standing up. Id. DC made the change, crossed out "no," circled "yes,"

and initialed it. Id. at 79. Schlachter believed he probably told her to initial the change. Id. DC told him that she believed number two had the same jaw line and facial structure as the robber. Id. at 80. DC expressed no doubt. Id. Schlachter took notes; he wrote down that DC cited the jaw line and facial structure as the reason for the positive identification. Id. at 102.

Schlachter said that he did not recognize the suspects in the first or second lineups; he did not learn that the defendant was in position two until he was done interviewing DC and was turning in the forms. Id. at 81. Schlachter admitted it was unusual for a witness to change his or her mind during the course of or after a lineup. Id. at 82. He also admitted that he could not pick out the defendant from the lineup even though he had seen the video and the booking photo. Id. at 90-92.

Schlachter also confirmed that another witness identified the defendant. Id. at 82. Barnes, the co-defendant, identified himself as the individual involved and identified the defendant as his co-actor. Id. at 85. Barnes and the defendant had a long-standing relationship. Id.

The defense called Professor Lawrence Todd White, a professor of social psychology from Beloit, Wisconsin. Id. at 109. In his research over the past thirty-five to forty years, Professor White has focused on the "intersection of psychology and law, including eyewitness testimony and eyewitness identifications." Id. at 109. The defense asked Professor White to review the reports generated by the robbery of the Cricket cell phone store and to review the surveillance video. Id. at 111. Professor White testified that it was an

unusual lineup with the wheelchairs and blankets, but otherwise standard with six people. Id. He expressed concern with the post-lineup interview when DC changed her response during a conversation with an officer working on the case. Id. at 112. Professor White testified that the "first identification decision is the best one in terms of predicting actual accuracy." Id. at 113. Subsequent expressions of certainty can be influenced by extraneous factors. Id. According to Professor White, there are "many, many studies that have examined the relationship—the statistical relationship between expressions of certain and actual accuracy." Id. Subsequent expressions are less useful because a witness's confidence goes up over time. Id.

Professor White was not aware of studies that examined whether a witness should or should not be interviewed after a lineup. Id. at 114. Other police departments will conduct post-lineup interviews to get the witness to express a level of certainty or the form allows the witness to express a level of certainty without officer interaction. Id. at 115. Professor White thought it best to record the interview because an officer working on the case may inadvertently say something or do something that improperly influences the decision making process. Id. at 116. Professor White testified that he did not like an officer asking what made the witness certain because that assumed the witness had a level of certainty. Id. at 117. Finally, he expressed concern that Schlachter told the witness there would be further investigation before anyone was arrested because that could lower the threshold for choosing a particular subject. Id. at 119. Although he could not assign a degree of harm, he said that

telling a witness there will be further investigation creates a "potential for harm." Id. at 125.

Professor White did not think the lineup was biased against the target. Id. at 120. He believed the lineup was flawed, however, because the persons administering the lineup were not blind to the suspect's identity. Id. That DC expressed an initial level of confidence between sixty and seventy-five percent was, in his view, low and unreliable. Id. at 121. He did not think a witness who had said "no" to everyone in the lineup should be interviewed. Id. at 122. In addition, Professor White did not believe that Schlachter did not know the defendant was number two in the lineup. Id. at 123. He asserted that number two was the only one who was agitated and appeared to be resisting the procedure. Id.

According to Professor White, the importance of double blind procedure has been recognized among researchers for at least twenty to twenty-five years. Id. at 124. He believed a post-lineup interview was not necessary, potentially harmful, and that there is "nothing that a detective or anyone else can do or say that will magically improve someone's ability to recall the face of a stranger that was seen four days earlier with a baseball cap and sunglasses." Id. at 127. With respect to the speed in which a witness identifies a subject, he testified that quick choosers are more accurate. Id. at 129. He thought that DC would be classified as a "slow chooser" but no one asked her that question directly. Id.

Finally, the defense asked Professor White about a witness' ability to recall facial features. Id. at 131. He explained that many studies have found "generally people are less able to distinguish among and recall faces of people of different races." Id. Hispanic witnesses, for example, were better able to identify Hispanic faces than African American faces. Id. at 131. Similarly, there is a "weapon focus effect" in which a visible weapon grabs the witness' attention and leaves less attention to focus on the robber's face. Id. at 132. Professor White also described the effect of emotional arousal and levels of stress on identification reliability and accuracy. Id. at 133. Professor White summarized his opinion as follows:

> [DC's] identification is unreliable because strangers were involved. And almost all misidentification cases are strangers, not people we know well. Strangers were involved, they were effectively disguised with sunglasses and caps, there was a weapon involved, it's a cross-racial identification. DC told the police that she was upset, and I think I heard the detective say that she was scared. Four days had passed before looking at the live lineup, and our memories for the faces of strangers fade rapidly over time. But I think most importantly, the fact that she circled no to number two and then later changed it to yes. To me, that's the most important indication that her identification is not reliable. There's no indication that she initially thought to a high level of certainty that number two was one of the robbers.

Id. at 134.

On cross-examination, Professor White admitted that there were only three different publications on his curriculum vitae from the 1990s about witnesses. Id. at 135-136. Professor White had an interest in this subject because he teaches a course every year or two about psychology and the law. Id. at 136. In addition, he gave presentations to different organizations in

different states, with most coming from state public defender workshops. Id. He did not review all of the reports associated with the investigation. Id. at 138. Professor White's sole focus was whether or not the conditions were such that the identification was reliable—not whether it was actually correct. Id. at 138-39. In the studies about the weapon focus effect, the witness saw the gun for a shorter period than the robbery at Cricket Mobile. Id. at 142. In addition, Professor White admitted that DC had the opportunity to see the robbers from various angles as they moved through the store, that he did not know whether stress played a role in DC's ability to recall the events and that the defendant did not hold the gun. Id. at 143-144, 156. He admitted that the lighting was good on the day of the robbery, that DC stood in close proximity to the robbers, that DC is neither old nor young and that DC appeared attentive in the lineups. Id. at 155-156. He indicated that only fifty to sixty percent of lineups reviewed by Professor White have been "pristine." Id. at 151.

C.    Judge Jones's Report and Recommendation

Judge Jones noted that the defendant did not challenge the lineup; the defendant challenged only the post-lineup interview during which DC changed her answer and identified the defendant. Dkt. No. 46 at 8. Judge Jones applied a two-step analysis to determine whether the procedure violated the defendant's constitutional rights: whether the process was unduly suggestive, and, if so, whether the identification was nevertheless sufficiently reliable. Id. at 7 (citing United States v. Recendiz, 557 F.3d 511, 524 (7th Cir. 2009)).

Judge Jones determined that the post-lineup interview was unnecessary because DC did not make a positive identification during the defendant's lineup. Id. at 9. The MPD standard operating procedure does not say what to do after a negative identification and Judge Jones found no good reason to conduct an interview. Id. at 9-10. Even so, Judge Jones concluded that the procedure was not unduly suggestive. Id. at 10. DC had a gut feeling during the lineup, she immediately changed her mind after the lineup, and she was adamant that Schlachter said nothing to make her change her mind. Id. Schlachter offered similar testimony—DC told him that number two was the robber after she handed him the form. Id. He did not tell her to change her answer or indicate that she had made the correct choice. Id.

Judge Jones found no evidence that Schlachter steered DC to pick the defendant. Id. at 12. The evidence showed that the identification of number two originated with DC—not Schlachter. Id. And, while it would have been preferable to use the double blind method, the Supreme Court has not adopted a rule that only the best approach may be used. Id. at 13 (citing United States v. Johnson, 745 F.3d 227, 229 (7th Cir. 2014)). Finally, Schlachter did not ask what made her certain until after she changed her answer. Id. at 13.

Judge Jones next found that based on the totality of the circumstances, DC's identification was reliable. Id. at 14. The surveillance video documented the amount of time that DC saw the robbers (approximately two-and-a-half minutes), in close proximity and on a sunny day. Id. DC focused her attention on the two robbers; there were no other customers in the store. Id. at 15. Judge

Jones concluded that the "weapon-focus effect" did not materialize in this case because DC provided a thorough and accurate description of the robbery, recalling very specific details. Id. She provided the description within minutes of the robbery, and the video showed that she remained calm and composed. Id. at 18. Judge Jones admitted that the descriptions were "not perfect" but "more than ordinarily thorough." Id. at 19 (citing United States v. Goodman, 797 F.2d 468, 470 (7th Cir. 1986)).

Judge Jones found the only factor weighing against reliability was the fact that DC changed her mind. Id. at 17, 19. Professor White explained that research shows that the initial level of certainty is the best predictor of accuracy; DC did not provide a level of certainty at the time she switched her answer. Id. at 17. Regardless, this factor did not result "in a substantial likelihood that Mr. Lovejoy was misidentified." Id. at 19. While he conceded that it might affect the weight a jury would give the identification, Judge Jones concluded that it did not affect the reliability of the identification itself. Id.

D. Defendant's Objection

The defendant argued that all the "red-flags and available information about the surrounding circumstances of that post-lineup interview require a finding that the interview was unnecessarily suggestive as to create a substantial likelihood of irreparable misidentification." Dkt. No. 50.

The defendant first objected to the finding that DC was "adamant" that Schlachter did not say anything to make her change her mind. Id. DC testified that she could not recall what was said in the interview. Id. at 2. The defendant

pointed to evidence that influence can occur both consciously and subconsciously. Id. And Schlachter testified that he told DC—before she changed her mind—that "just because she circled yes to a certain individual, that does not mean that the person automatically gets arrested or charged with any crime." Id. Professor White thought that would lower DC's threshold for making a choice. Id.

The defendant pointed to differences in the way that DC completed the identification forms for Barnes and the defendant. Id. at 3. With Barnes, DC placed a question mark next to the number because she wanted to see the other four individuals before she checked "yes." Id. at 4. She did not put a question mark next to the defendant in the second lineup. Id. Instead, she circled "no" when she completed the form. Id. The defendant argued that the only logical conclusion is that Schlachter's statement influenced DC. Id. at 5.

The defendant also objected to Judge Jones's conclusion that the identification was otherwise reliable. Id. at 7. According to the defendant, Judge Jones should have given DC's low level of certainty more weight. Id. Professor White testified that the initial impressions of certainty are the most accurate. Id. He also testified that the speed of the initial description is important. Id.

The defendant took issue with Judge Jones's conclusion that DC's ability to provide a description adds to the reliability; the defendant pointed out that DC said the defendant had a dark complexion (his complexion is light), she thought he was seven to eight years younger (twenty-four to twenty-five rather

than thirty-two), she described him as having a medium build (he has a light build) and there is a four- to five-inch height difference between her description and the defendant's actual height (5' 7" to 5' 8" rather than 6' 0"). Id. at 8. Professor White testified that witnesses are less able to distinguish between faces and to recall the faces of people from a different race. Id. at 9. And the presence of a disguise cast further doubt on the reliability. Id. at 10.

E.    Government's Response

The government agreed with Judge Jones that the defendant did not meet his burden in demonstrating that the identification was unduly suggestive. Dkt. No. 51 at 3. The government noted that Judge Jones acknowledged DC's inability to recall whether anything was said in the interview but noted that she "was adamant that Detective Schlachter did not say anything to make her change her mind." Id., quoting dkt. no. 46 at 10.

The government also pointed out that Judge Jones addressed the argument that the officers failed to follow the best practices for the lineup. Id. at 3-4. The government quoted Judge Jones's finding that the "procedures of trial—such as [a] robust cross examiner—are sufficient 'to allow jurors to separate reliable from mistaken identifications.'" Id., quoting dkt. no. 46 at 13 (which quoted Johnson, 745 F.3d at 229).

The government reminded the court that the defendant altered his appearance for the lineup. Id. at 4. He refused to stand and took down the braids; officers had to cover him with a blanket in a wheelchair. Id. This meant that DC couldn't see the defendant standing, the way he had been during the

robbery. Id. The government opined that, "[n]ot surprisingly, DC had trouble identifying [the defendant] as the robber because of his attempts to manipulate the lineup." Id.

The government also maintained that while Judge Jones could have stopped his analysis after concluding that the defendant had not met his burden to show that the lineup was suggestive, he nonetheless went further and considered whether the identification was otherwise reliable. Id. The government asserted that Judge Jones got it right in his analysis of each of the relevant reliability factors: DC provided an accurate description (with the exception of skin color), DC had good opportunity to view the robbers, DC's attention to detail was exceptional, and only four days passed between the robbery and the identification. Id. at 5. The government argued that defense counsel can cross-examine DC on her failure to initially identify the defendant. Id.

F.    Defendant's Reply

The defendant emphasized that "DC's change of mind could have occurred because of conscious *or subconscious* suggestiveness." Dkt. No. 52 at 1 (emphasis in the original). He argued that "DC may not have been aware of the effect that Dt. Schlachter's words or body language may have had on her," and therefore the fact that she doesn't remember whether anything Schlachter said or did impacted her decision should not be determinative. Id. The defendant also emphasized Schlachter's testimony that DC changed her mind after Schlachter told her that just because she circled yes didn't mean there

wouldd be further investigation. Id. at 1-2. The defendant asserted that the fact

that his hair was unbraided during the lineup is irrelevant, because DC

testified that she didn't see his hair during the robbery. Id. at 2.

## II. Analysis

### A. Standard of Review

Rule 59(b) governs dispositive motion practice initiated before magistrate

judges. Fed. R. Crim. P. 59(b). If a party objects to a magistrate judge's

recommendation, the district judge must review *de novo* the portions of the

recommendations to which a party timely objects. 28 U.S.C. Section 636(b)(1);

Fed. R. Crim. P. 59(b)(2), (3). The court can "accept, reject, or modify in whole

or in part, the findings or recommendations made by the magistrate." 28 U.S.C.

§636(b)(1).

### B. Analysis

The Constitution does not mandate that lineups "meet a certain standard

of quality." Coleman v. City of Peoria, Ill., 925 F.3d 336, 347 (7th Cir. 2019)

(quoting Alexander v. City of S. Bend, 433 F.3d 550, 555 (7th Cir. 2006)). The

Fourteenth Amendment's Due Process Clause requires the exclusion of an

identification if "the unduly suggestive circumstances are so egregious as to

taint the entire trial." Id. (citing Perry v. New Hampshire, 565 U.S. 228, 240

(2012)). Even if there are suggestive components, the court looks to the totality

of the circumstances to determine whether the identification remains

sufficiently reliable *despite* the suggestive procedure. Perry, 565 U.S. at 232.

The court realizes that the standard is whether, despite suggestive components, the totality of the circumstances shows that the identification was reliable. Usually, the analyzing court does what Judge Jones did—determines whether the lineup was suggestive, and then goes on to determine whether, despite that suggestiveness, the identification was nonetheless reliable. This court finds it helpful to conduct the analysis in the inverse.

      1.    *Reliability*

In determining the reliability of an identification procedure, courts consider the following factors: "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation." <u>Gregory-Bey v. Hanks</u>, 332 F.3d 1036, 1045 (citing <u>Neil v. Biggers</u>, 409 U.S. 188, 199-200 (1972)).

           a.    Opportunity of the witness to view the criminal at the time of the crime

DC testified that she had the opportunity to view both individuals during the robbery; the video surveillance from the store confirms that she had the time and opportunity to do so. DC testified that the robbery occurred mid-afternoon and that it was sunny—a nice day outside. Dkt. No. 39 at 15. The two men came into the store and stood on the other side of a three-foot table before engaging her in conversation. <u>Id.</u> at 17. The individual with the gun crossed to her side and she followed the defendant without the gun to the back room. <u>Id.</u> at 18. She returned to the front room with the men.

From the surveillance video, the court could confirm that the men stood in close proximity to DC—initially across the counter facing her and then on her side. Dkt. No. 38, Ex. 1. The store was small and well-lit, with the sunlight coming through the windows. Id. The two men remained in the store for approximately two minutes and thirty-three seconds. Id. They left as another man entered. Id. DC escorted the third man out and called the police. Id. She had ample opportunity to view the two men who committed the crime.

This factor weighs in favor of the reliability of DC's identification of the defendant.

b.      The witness's degree of attention

DC testified that she had prior training regarding what to do in the event of a robbery. Dkt. No. 39 at 13. She knew that she should remember as much as she could about the person's physical features, height and relevant details. Id. At the time of this robbery, no other employee or customer was in the store. Id. at 14; Dkt. No. 34 at ¶1. DC testified that while standing between the two men in the back room, she concentrated on remembering their features. Dkt. No. 39 at 19. She continued to do the same when they returned to the front of the store to empty the register while she stood in the doorway. Id. at 21.

Professor White testified about the weapon-focus effect, where the presence of a weapon detracts from a person's ability to recall other features. Professor White admitted, however, that he did not know if that occurred in this case, and the defendant was not the person with the weapon, so any such affect would be less likely in her identification of the defendant. DC recalled

very specific details, such as the suspect wearing a glove that covered only his right thumb and index finger and the fact that he placed the money in his right pocket.

This factor weighs in favor of the reliability of DC's identification.

### c.     The accuracy of the prior description

DC told Officer Scollin immediately after the robbery that suspect one (whom she identified as defendant) was 5' 7" to 5' 8", in his twenties and thin with a dark complexion; Barnes was the same, a little taller and armed. Dkt. No. 34 at ¶3; Dkt. No. 34-1. DC described suspect one to Schlachter as a "B/M, 24-25, 5'7"-5'8", 180 pounds, medium build, dark skin complexion, baseball cap, white shirt, dark pants, and a glove on his right hand covering his right thumb and index finger. Dkt. No. 34 at ¶ 6; Dkt. No. 34-2.

In contrast, the Milwaukee Police Department arrest report describes the defendant as thirty-two years old, 6' 0" in height, 175 pounds, light build, having a light brown complexion and a beard.

There are discrepancies between DC's initial description and the police department arrest report, particularly with respect to complexion and height. DC described the defendant as having a dark complexion but the surveillance video shows the suspect as having a light complexion and the person in position two in the lineup has a light complexion. DC also described the defendant as being between 5' 7 and 5' 8" but the police reports describe the defendant as being 6' 0". DC estimated that the defendant was twenty-four or twenty-five years old, but he was some seven or eight years older—thirty-two—

27

at the time of the robbery. DC told Scollin that the defendant had a "thin" build; she told Schlachter that he had a "medium" build. The police reports describe the defendant as having a "light" build. Finally, the police report indicates that the defendant had a beard, while DC made no mention of facial hair.

When one views the surveillance video of the robbery, it appears that DC is shorter than both men. Arguably, this could contribute to her mis-estimation of the defendant's height. There may be reasons that DC was off on her estimate of the defendant's age, including the fact that he may look younger than he is (the court can't really tell from viewing the surveillance video or the video of the lineup). It is concerning that despite the effort DC put into focusing on the details of the men's faces, she was off on skin tone and apparently missed the defendant's facial hair.

On the other hand, DC provided accurate information about some of the details of the offense, including the defendant's glove (covering just the thumb and index finger) and clothing.

Overall, the court concludes that this factor weighs against the reliability of the identification.

    d.  The level of certainty demonstrated by the witness at the confrontation

When she filled out the form, DC circled "no" for the person in position two in the lineup. She did not state a level of certainty when she did so. During the post-lineup interview with Schlachter, she told Schlachter that she knew it was the defendant because of his jaw line and facial features. Months later, at

the evidentiary hearing, DC told Judge Jones that when she saw the person in position two during the lineup, she "had the same type of, like, gut feeling." Dkt. No. 39 at 33, line 24. She testified that it was during the interview with Schlachter that realized that number two was the robber. Id. at 34, line 22. She testified that at the time she saw the person in position number two during the lineup, she "want[ed] to say" that she was "about like 75, maybe 60 percent" certain that he was the robber. Id. at 42, line 13. She told Judge Jones that by the time of the post-lineup interview with Schlachter, however, she was 100 percent sure, because she " was focusing more on what [she] saw with this person in the lineup, like what features [she] was able to – because [she] wasn't able to see this person the way [she] did before it happened." Id. at 42, lines 14-20. That was because in the lineup he was sitting down. Id. at line 22.

While DC marked "no" next to position two at the time she filled out the lineup form, she did not say how certain or uncertain she was that number two was not the robber. She told Judge Jones that she was sixty-five to seventy percent certain (despite having marked the "no" box); Professor White testified that this was low level of certainty, and that it was more reliable than her second estimation of 100 percent. But the second estimation of 100 percent came only moments after the lineup, and with no leading or prompting from Schlachter. So DC appears to have had *some* level of confidence in her conclusion that the robber was the person in position number two—enough to cause her to change her answer, without prompting, to "yes" as to number two.

This factor provides some support for the reliability of the identification, but also argues against its reliability.

        e.      Length of time between the crime and the confrontation

Only four days passed between the robbery and the lineup in which DC identified the defendant. The Seventh Circuit has said that "five days between the incident and the line-up is not such a long span of time that memory lapses would be a problem." <u>United States v. Downs</u>, 230 F.3d 272 (7th Cir. 2000); <u>see also</u> <u>United States v. Traeger</u>, 289 F.3d 461, 473 (7th Cir. 2002) ("the lineup took place only 3 weeks after the robbery, at a time when the robber's appearance was still fresh in [the victim's] memory"); <u>United States v. Jones</u>, 454 F.3d 642, 650 (7th Cir. 2006) (identification nine days after event "a relatively short delay").

        f.      Conclusion

The court concludes that the totality of the circumstances in this case weigh in favor of reliability.

        2.      *Suggestiveness*

That said, the lineup procedures used in this case "[fell] short of the ideal." <u>Sexton v. Beaudreaux</u>, 138 S. Ct. 2555, 2559 (2018). DC did not identify the defendant in the lineup. Schlachter conducted an unnecessary post-lineup interview; nothing in MPD policy requires an interview after a witness fails to make an identification. Even if there were such requirement, Schlachter had no training on how to conduct such an interview. And Schlachter advised DC that

picking someone didn't automatically result in an arrest, which Professor White

testified could embolden her to make a choice despite uncertainty.

The court concludes, however, that the unnecessary interview and

Schlachter's comment did not undermine the entire lineup procedure. DC

testified that Schlachter said nothing to make her change her mind:

> Q.   Was there anything that was said between the two of you
>      that changed your mind about who was – about who to circle
>      on the Lineup Identification Form?
>
> A.   No.
>
> Q.   How again did you come to realize that the person in position
>      number two was, in fact, the second subject involved in the
>      robbery at the Cricket Mobile?
>
> A.   He was the one that stood out to me. And with the gut
>      feeling I had, I knew it was him.

Dkt. No. 39 at 35, lines 6-14. Judge Jones followed up after DC's direct

examination by asking whether Schlachter encouraged her, "in any way," to

positively identify a suspect; DC replied "no." Id. at 41, lines 7-9.

The defendant relies heavily on Schlachter's testimony that he told DC—

before she changed her answer—that "just because she circled yes to a certain

individual, that does not mean that person automatically gets arrested or

charged with any crime. There's further investigation that takes  place after the

lineup is conducted." Id. at 78. He does not recall saying anything else to her

before she changed her answer. Id. at 79. He testified that it was immediately

after he told DC this that she crossed out "no," circled "yes," initialed the

change, crossed out the "not identified," circled "identified," and told Schlachter

that she was certain because the jaw line and facial features were the same. Id. at 80.

Perhaps the defendant and Professor White are correct that Schlachter's statement to DC emboldened her to make *some* choice. Perhaps an officer telling a witness that officers will further investigate after a lineup could assure a witness that if she made a mistake, subsequent investigation could remedy that mistake. Making such a statement does not appear to be good practice for that reason. But even if Schlachter's statement was not good practice, it did not suggest to DC *which* choice to make. Maybe the post-lineup process suggested to DC that it was okay to make a less certain choice, but it did not suggest to DC which of the six individuals she should choose. Schlachter's statement didn't create a "substantial likelihood of irreparable misidentification." See Perry, 565 U.S. at 231.

The facts of this case are less suggestive than those in United States v. Griffin, 493 F.3d 856 (7th Cir. 2009). In Griffin, a detective showed a victim a photo array which included the defendant. Id. at 865. The victim did not identify anyone from the photo array. Two months later, the same victim saw a physical lineup and identified the defendant. Id. The defendant argued that the identification process was unduly suggestive because the victim identified him only after she saw him in two different processes—a photo array and a physical lineup. Id. The Seventh Circuit disagreed, finding that that there was nothing "per se impermissible about placing the same suspect in two different

identification procedures." Id. (quoting United States v. Harris, 281 F.3d 667, 670-671 (7th Cir. 2002)).

If the fact that the witness in Griffin saw the same person in two different procedures was not suggestive enough to render identification unreliable, then, given the other indicia of reliability, Schlachter's unnecessary post-lineup comment to DC that making a choice would not automatically result in an arrest because there would be more investigation was not suggestive enough to render her identification of the defendant unreliable.

## III. Conclusion

The court **OVERRULES** the defendant's objections to Judge Jones's recommendation. Dkt. No. 50.

The court **ADOPTS** Judge Jones's recommendation. Dkt. No. 46.

The court **DENIES** the defendant's motion to suppress the lineup identification. Dkt. No. 20.

The court's staff will contact the parties to discuss further scheduling.

Dated in Milwaukee, Wisconsin this 15th day of October, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**